## ELKIN MOTOR COMPANY v. JOE HATTON RAGLAND, by next friend, etc.

Middle Section.　October 1, 1927.

Petition for Certiorari dismissed by Supreme Court, January 21, 1928.

1. **Negligence. Failure to comply with the law of the road is presumed negligent unless explained.**
   Where no overruling necessity for a non-compliance with the law of the road appears, it will be assumed that one who failed to comply with it was negligent, and, if injury and damage result, that such negligence was the proximate cause of such injury and damage.

2. **Master and servant. Evidence. Evidence held sufficient to show agent was acting in scope of employment.**
   Where the evidence showed that a mechanic at a garage had authority to show and sell cars when the manager was away and the evidence further showed that at the time of the accident the mechanic had had a car out to show it for sale, held that at the time the mechanic was acting within the scope of his employment.

3. **Master and servant. Ordinarily a master is liable for acts of a stranger whom his servant, upon express or implied permission, permits to drive his car.**
   For obvious reasons, the authorities very generally agree that, where the servant employed to operate an automobile permits a stranger to drive it in his place, upon the express or implied permission of the owner, a liability for the negligent operation of the automobile while so driven may be fixed upon the owner.

4. **Trial. A verdict can not be sustained unless there is evidence to prove the negligence alleged.**
   A case should not be submitted to the jury and the verdict can not be sustained unless there is evidence reasonably tending to prove the negligence alleged in the declaration as the cause of plaintiff's injury.

5. **Master and servant. Master held not liable for acts of a stranger committed while servant was asleep.**
   It is a recognized rule that a master will be liable for the acts of a stranger where his servant is present and directing the stranger, but where the servant is present but asleep it can not be said that the stranger is acting under his direction and the master can not be held for the acts of the stranger under such circumstances.

6. **Negligence. Pleading. Petition held to state a cause of action under proof adduced.**
   Where the petition alleged that the servant of the master negligently turned the car over to one who could not drive and the proof showed that the servant had permitted his wife, who was incompetent, to drive the car,

held that this was an act of negligence and that the master was liable for damages caused by the wife.

7. **Trial. Instructions. Where the trial court does not give instructions covering a party's theory it is his duty to request a correction.**

Where it was urged as error that the trial judge did not correctly interpret the defendant's theory as presented by its pleading, proof and argument of counsel, held it was the duty of the defendant through counsel to call the matter to the attention of the court and request a correction and a failure to do so was a waiver of the error.

8. **Appeal and error. Assignments of error must comply with rules of court.**

Where it was assigned as error that the court erred in overruling defendant's exceptions to certain testimony and the page of the record where the testimony might be found was not set out, held that the assignments did not comply with the rules of court and would not be considered.

9. **Trial. Verdict held not to show prejudice on the part of the jury.**

In an action for personal injuries where it was shown that the plaintiff, a young boy, had lost his hearing in one ear and had suffered a nervous shock, held that a verdict of $4500 was not such as would indicate prejudice or passion on the part of the jury.

10. **Damages. Verdict of $4500 held not excessive for loss of hearing in one ear and nervous shock.**

In an action to recover damages for personal injuries where the evidence showed that the plaintiff, a young boy, had lost his hearing in one ear and had suffered a nervous shock, held that a verdict of $4500 was not excessive.

Appeal in Error from Circuit Court, Wilson County; Hon. Albert Williams, Judge.

Affirmed.

William Hume, of Nashville, for plaintiff in error.

W. S. Faulkner, of Lebanon, for defendant in error.

FAW,.P. J.  This is an action brought in the circuit court of Wilson county by Joe Hatton Ragland, a minor suing by next friend, to recover for personal injuries and the loss of an automobile suffered by him as the result of a collision between his automobile and an automobile owned by defendant below, Elkin Motor Company, a Tennessee corporation.

In the circuit court the case was tried to a jury upon the issues made by defendant's plea of not guilty to plaintiff's declaration, and the jury found the issues in favor of plaintiff and assessed his damages at $4,500, for which sum, and for the costs of the cause, judgment of the court was rendered against the defendant Elkin Motor Company.

The defendant has prayed, obtained and perfected an appeal in the nature of a writ of error from the order of the trial court denying and overruling defendant's motion for a new trial.

For convenience, we will continue to designate Joe Hatton Ragland as plaintiff and the Elkin Motor Company as defendant.

Through its first and second assignments of error defendant asserts that the trial court erred (1) in overruling defendant's motion for peremptory instructions to the jury to return a verdict in favor of the defendant, and (2) that there is no evidence to sustain the verdict of the jury. In substance, the first and second assignments, supra, raise the same question, for if there was sufficient evidence to carry the case to the jury, there was necessarily some evidence to support the verdict of the jury. Citty v. Miller, 1 Tenn. App. R. 1.

It is disclosed by the evidence, and is undisputed, that, about ten o'clock p. m. on Sunday, June 20, 1926, there was a collision between an automobile owned by defendant and an automobile owned and driven by plaintiff, which inflicted serious personal injuries on plaintiff and practically destroyed the value of his automobile. The collision occurred about a half-mile west of Watertown, Tennessee, on the public highway leading from Watertown to Lebanon. There is ample evidence to support a finding that as plaintiff's automobile approached the scene of the collision, and when the collision occurred, plaintiff was driving at a lawful rate of speed and in compliance with the law of the road embodied in our statute which requires that drivers of vehicles meeting on opposite courses shall each keep to his right side of the road.

There is also ample evidence to support a finding that defendant's automobile was being driven around a curve on its left side of the highway when it struck and completely overturned plaintiff's car. The record discloses no occasion for the presence of defendant's car on the wrong side of the highway. Where no overruling necessity for a non-compliance with the law of the road appears, it will be assumed that one who failed to comply with it was negligent, and, if injury and damage results, that such negligence was the proximate cause of such injury and damage.

In this court it seems to be conceded by defendant, at least tacitly, that the evidence before the jury was sufficient to sustain a finding that the collision, and the resulting injury to plaintiff, was caused by the negligent operation of the defendant's automobile. Such concession is amply justified by the record.

In his brief, the learned and able counsel for defendant limits the scope of defendant's first and second assignments of error to two inquiries, as follows:

(1) "Was the defendant's automobile, at the time of the accident, being used in furtherance of the defendant's business?"

(2) "Was Mrs. Ingram an agent or servant of the defendant, justifying the application of the doctrine of respondeat superior?"

The facts bearing upon the questions thus raised are these: The defendant Elkin Motor Company has its principal place of business at Lebanon, but, at the time of the transactions which gave rise to this lawsuit, it had a branch establishment at Watertown, where it

sold new and used automobiles and repaired automobiles for the public. L. R. Stevens was the manager of defendant's Watertown business, which was conducted under the name and style of Wilson county Motor Company. J. H. Ingram, an automobile mechanic, was employed as foreman of the repair shop of the Wilson county Motor Company at Watertown. As such foreman and mechanic, Ingram was subject to the direction and control of Stevens, the manager. Ingram was not employed primarily as a salesman, and the proof tends to show that he did not effect any sales of automobiles while in the service of defendant, but Stevens testified that, in his absence, Ingram had authority to show cars to prospective purchasers; and Ingram testified, without objection, that in the absence of Stevens he (Ingram) had "full authority and charge" of the defendant's business at Watertown, including the right to show and sell cars.

Stevens, the manager, was not in Watertown on Sunday, June 20, 1926. He had gone to Louisville, Kentucky, on Saturday, the 19th, and remained there over Sunday. Before leaving Watertown on Saturday, Stevens instructed Ingram to make a "service call" at Commerce, a few miles from Watertown, on the next day, Sunday. This order of Stevens was executed by Ingram during the forenoon of Sunday, the 20th, and about the middle of the afternoon of the same day, Ingram, accompanied by his wife, drove to Lebanon, a distance of about twelve miles, in a used car (a Ford coupe) owned and held for sale by his employer, the defendant, at Watertown. Ingram and his wife remained in Lebanon until about nine o'clock in the evening of that day and then returned to Watertown in the same car, but before leaving Lebanon, Ingram turned the wheel over to his wife, at her request, and about midway between Lebanon and Watertown Ingram fell asleep, and remained asleep for several miles and until he was awakened by the "crash" of the collision with plaintiff's car, which occurred, as before stated, about a half-mile from Watertown. The defendant's counsel sought to show by Ingram that he was intoxicated and for that reason surrendered the wheel to Mrs. Ingram and fell asleep, but this was denied by Ingram, who testified that he took only one small drink while in Lebanon, and that he was entirely sober throughout the evening. There was no other testimony on that subject.

It is insisted for defendant that the purpose of Ingram and wife in driving to Lebanon was to visit their parents, who lived in Lebanon, and that they were using defendant's car on that occasion purely for their own convenience and pleasure, and not in the service or upon the business of the defendant. It is an undenied fact, appearing from the testimony of Mr. and Mrs. Ingram, that they spent a part of the afternoon at the home of Mrs. Ingram's parents, and that Mrs. Ingram spent the remainder of their stay in Lebanon

on that evening at the home of Mr. Ingram's mother. Mr. Ingram was with his wife at his mother's home during a part of her stay there, but he was "around town" for thirty minutes, possibly longer, while his wife was at his mothers home.

It is the theory of the plaintiff that Ingram took the defendant's car to Lebanon at the time stated for the purpose of showing it to two prospective buyers with a view of selling it to them, and that he was, therefore, using the car for the benefit of his employer, the defendant, and within the scope of his employment; and Ingram, in substance, so testified. He stated that before Stevens, the manager, left for Louisville on Saturday, the 19th, he (Ingram) told Stevens that he was going to Lebanon in a car to show it to some parties that were interested in a "second-handed car;" that he "had two prospects to sell that second-hand car to," and that Stevens told him to "go and try to sell it."

Ingram testified further that he had two "prospects" at Lebanon to whom he expected to show the car; that one of them was his brother-in-law; that he made two trips out to his brother-in-law's place while in Lebanon but his brother-in-law was not at home and he was unable to find him, although he "looked for him all the evening;" that the other prospect was sick, and he didn't get to show the car to either of the prospects.

Mrs. Ingram testified that she knew that her husband was going to Lebanon that day to show a car to some prospective purchasers; that she knew that after he got to Lebanon he went and looked for the prospects; that she and her husband were delayed about returning to Watertown by the efforts of Mr. Ingram to find the "prospects," and that she remembered that one of them was sick.

Mr. Stevens testified that he gave Ingram no instructions to go to Lebanon on the Sunday in question, and that he did not know that Ingrams intended to go, or that he had gone, to Lebanon, until after his (Stevens) return from Louisville, when Ingram told him about it. This conflict between the testimony of Stevens and that of Ingram (each of whom was introduced as a witness on behalf of defendant) was, if material to the issues, a matter for the jury to settle, and the verdict implies that the jury accepted the statement of Ingram.

We are of the opinion that the testimony we have stated constituted material evidence that, in driving defendant's car to Lebanon on the occasion in question, Ingram was acting within the scope of his employment and "in furtherance of the defendant's business." This conclusion would end the inquiry, under defendant's first and second assignments of error, if Mr. Ingram had been driving the car at the time it collided with plaintiff's car, for Ingram's authority to drive the car to Lebanon in order to show it to prospective purchasers included authority to return it to defendant's garage at Watertown.

But the fact that Mrs. Ingram, a mere volunteer, was driving the defendant's car when it was negligently driven against plaintiff's car injects a further inquiry into the case. The question thus arising has been the subject of much judicial investigation and many decisions. See Ulman v. Linderman (N. D.), 10 A. L. R. 1440, 176 N. W., 25, and the following Annotations: 13 L. R. A. N. S., 572; 45 L. R. A. N. S. 382; 44 A. L. R. 1382.

For obvious reasons, the authorities very generally agree that, where the servant employed to operate an automobile permits a stranger to drive it in his place, upon the express or implied permission of the owner, a liability for the negligent operation of the automobile while so driven may be fixed upon the owner.

The undisputed testimony of Mr. Stevens, defendant's manager at Watertown, negatives the idea that Mr. Ingram had express authority from defendant to permit Mrs. Ingram to drive the car on the occasion in question. We quote from Mr. Stevens' testimony as follows:

"Q. Had you ever given permission to Mrs. Ingram to drive one of yours cars? A. No sir.

"Q. Did you know that she was driving your car on this occasion? A. I did not.

"Q. Did Mr. Ingram have authority from you to permit anybody else to drive a car when he took it out? A. None whatever. .

"Q. Had you ever ratified or approved any act on his part on any former occasion if he did permit anyone to drive your car when it was taken out? A. No sir."

Authority in a servant operating an automobile in his employer's service to employ or permit a stranger, that is, one having no contractual relation to the employer, to drive the car may be implied, where such assistance to the defendant's driver becomes necessary because of the nature and character of the employment, or by reason of an emergency; but there is no evidence in the instant case which would afford a basis for a finding that Mr. Ingram had authority from defendant, either express or implied, to permit Mrs. Ingram to drive defendant's car.

Therefore, laying aside, as inapplicable to the facts of this case, the theory of the master's liability on the ground of his express or implied consent to the substitution of a stranger in the place of his servant, we next inquire whether there is any other predicate for liability of the defendant in the pleadings and evidence in this case. We say in the pleadings and evidence, because it is fundamental that proof alone is not sufficient to sustain a verdict. The case should not have been submitted to the jury, and the verdict cannot be sustained, unless there was evidence reasonably tending to prove the negligence alleged in the declaration as the cause of the

plaintiff's injuries. Cotton Oil Co. v. Shamblin, 101 Tenn., 263, 271, 47 S. W., 496; E. Tenn. Coal Co. v. Daniel, 100 Tenn., 64, 73, 42 S. W., 1062; Railroad Co. v. Collins, 85 Tenn., 227, 230, 1 S. W., 883; Railroad v. Lindamood, 111 Tenn., 457, 462, 78 S. W., 99; Foster v. Jackson, 8 Baxt., 433; Jaquette v. Capitol Traction Co., 25 LRANS, 407, 410; Maynard v. Oregon R. and N. Co., 68 LRA, 477, 482; Hall v. Northern Pacific R. Co., 14 Anno. Cas., 960, 961; 21 R. C. L., p. 608.

Plaintiff's declaration contains two counts. In the first count it is alleged that a car of the defendant, being driven by the agents of the defendant, in the employ of the defendant, approaching plaintiff, instead of turning to the right to permit the passage of the two cars, was, by the said agents of the defendant in charge of and driving said car, turned to their left and to the left of the road, and wantonly, negligently and carelessly by them driven into and against the car of plaintiff, etc. In the second count of the declaration it is alleged that the agent placed in charge of said car by the defendant had, negligently and carelessly and with a wanton disregard of and for human life, gone to sleep and turned the operation and running of the car over to his wife, who was attending him and who was known to him to be inexperienced in driving and operating automobiles, hence, when defendant's car approached that of the plaintiff, instead of turning to the right to permit the passage of the two cars on the road, defendant's car turned directly to the left and carelessly and negligently ran into the car of the plaintiff, etc.

The conclusion heretofore stated that the defendant had not expressly authorized J. H. Ingram to direct or permit his wife, or anyone other than himself, to operate the car, and that there was nothing in the circumstances disclosed by the record from which such authority could be implied, precludes liability of the defendant on the legal theory that Mrs. Ingram was the agent or servant of the defendant. The cases in which the master has been held liable for the negligence of a stranger while engaged, without authority from the master, in the performance of the duties of said master's servant, at the request or with the permission of the latter, are not grounded upon the theory that one who thus assists a servant becomes thereby a servant of such servant's master. (13 LRANS, 576). Under such circumstances, the doctrine of respondeat superior does not apply as between the master and the stranger to whom the servant has entrusted the performance of the duty which the servant owes to his master. Hence, it is held in a number of cases digested in the Annotations heretofore cited that the master is not liable where the servant, without authority, delegates a particular task in its entirety to a stranger, and is not present and does not cooperate in the performance of the task by the latter. (45 LRANS, p. 383; 44 ALR, p. 1383).

But the master has been held liable for damage caused by his vehicle in a line of cases where the servant, employed as the driver of a horse-drawn carriage or of an automobile, directed or permitted a stranger to drive, but remained on the seat beside such stranger while the latter was driving.  This holding rests upon the theory that "when such acts are done in the presence of the servant, the actor is considered the alter ego of the servant, his acts are the acts of the servant, and therefore the master is liable for such acts" (44 ALR, p. 1385) ; or, as elsewhere expressed, "this holding is based upon the reasoning that the stranger is a mere instrumentality by which the servant or agent performs his duties, a longer arm which the servant or agent wields or controls; that the master's business is being performed, therefore, by the agent or servant through the stranger in question." (10 ALR, p. 1442).

It is seen that the presence or absence of the servant when the injury under investigation was inflicted by his substitute is the determining factor in cases of the class last mentioned.  Defendant's servant, J. H. Ingram, was on the seat beside his wife when she negligently steered defendant's car against plaintiff's car, but he was asleep.  Was he present or absent, within the contemplation of the rule here under consideration?

While asleep he was unconscious, and incapable of directing or observing the manner in which his wife was driving the car, and in that condition he could exercise no more control over the operation of the car by his wife than if he had been corporeally absent; hence, it cannot be reasonably assumed that Mrs. Ingram was merely an instrumentality—a "longer arm"—through which her husband was driving the car.

But it will be recalled that, in the second count of the declaration, plaintiff·predicates his action upon averments that the defendant's agent negligently and carelessly turned the operation of defendant's car over to one who was inexperienced in driving and operating automobiles, and went to sleep, and that such negligence of defendant's servant was the proximate cause of the injuries suffered by the plaintiff.

It is actionable negligence to commit the operation of an automobile to an incompetent driver, and if injury to others results, such negligence is deemed to be the proximate cause of the damage.  Berry on Automobiles, 3rd Ed., sec. 1040; 45 LRANS, p. 385.  In such case the servant is guilty of actionable negligence, and the master is liable under the familiar doctrine which imputes to him the negligence of his servant in the course of his employment.

There is evidence to sustain the averments of negligence contained in the second count of the declaration.  J. H. Ingram says in his testimony that his wife "wasn't very well experienced in driving"

and "had not been driving very much by herself." On motion for peremptory instructions, the party against whom the motion is made is entitled to the benefit of every reasonable inference of fact which the evidence will bear. Likewise, when testing an assignment that there is no evidence to sustain a jury's verdict, it is our duty to view the evidence in that aspect most favorable to the prevailing party of which it is reasonably susceptible.

Holding, as we do, that the second count of plaintiff's declaration states a good cause of action and that there is evidence reasonably tending to sustain the averments of that count, the defendant's first and second assignments of error are overruled.

Passing the third assignment of error for the present: the fourth assignment is that "the court was in error in failing to state fully and correctly the theory of the defendant, but stated only a part of it."

In his charge, the trial judge undertook to state the respective "theories" of the plaintiff and the defendant. If he stated "only a part" of the defendant's theory, the omitted part could have been supplied by a request, and if no such request was seasonably presented, the trial court will not be held in error because of such omission.

Moreover, if the trial judge did not correctly interpret the defendant's theory as presented by its pleadings, proof and argument of counsel (the sources from which the trial court ordinarily deduces the respective theories of the parties), it was the duty of the defendant, through his counsel, to call the matter to the attention of the court and request a correction; and a failure to do so was a waiver of the error. Hayes v. Cheatham, 6 Lea, 1, 7; McColgan v. Langford, 6 Lea, 108, 117; Malone v. Searight, 8 Lea, 91, 94; Slattery v. Lea, 11 Lea, 9, 12. The fourth assignment of error is overruled.

Defendant's fifth assignment is that "the court erred in overruling the defendant's exception to testimony of Mr. Ingram that the accident was his wife's fault, when it is admitted that he was asleep at the time the accident occurred."

There is no citation to a page or pages of the record where such testimony as that mentioned in the fifth assignment, supra, may be found.

This assignment does not comply with the rules of this court and of the Supreme Court, which require that "when the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, with citation of record where the evidence and ruling may be found." See Appendix to 1 Tenn. App. R., p. 3; 151 Tenn., p. 815. The Supreme Court has the same rule. See 126 Tenn., p. 722.

In the written argument of defendant's counsel, filed along with the assignment of error, it is said (under the head of "Assignment V") that "this assignment is based on testimony that was given by J. H. Ragland over the objection of the defendant, as follows:

"Q. What did Ingram say? A. Well he said it was all his fault and he would go and get the wrecker and bring it down there and carry the car back and have it fixed up and they would have no trouble about it.

"Q. He said it was all his fault. A. Yes sir."

It is seen that the testimony thus cited cannot be the testimony referred to in the fifth assignment of error, because the assignment complains of the admission of testimony of Mr. Ingram that the accident was his wife's fault, and the testimony which counsel quotes as supporting the fifth assignment is testimony of J. H. Ragland that Ingram said "it was all his fault." The court is therefore confronted with the precise situation which the rules above quoted were designed to prevent. The fifth assignment will be disregarded because it does not constitute a valid assignment of error.

We now recur to the third assignment of error, which is that "the verdict is so excessive as to indicate passion, prejudice or caprice on the part of the jury."

The proof is that when the collision in question occurred, the plaintiff received a severe blow on the head; that he did not sleep any that night; that early on the following morning he began to suffer intense pain in his head; that he was, on that morning, examined by Dr. McFarland and Dr. Gaston, of Lebanon, and pursuant to their instructions he was "put to bed" and remained in bed about ten days; that he was then carried to Dr. E. B. Cayce, at Nashville, and examined by him; that after his return to his home at Lebanon, and between that time and the trial of the case, he was examined on three occasions by Dr. Witherington.

Plaintiff testified that his hearing was good before he was injured in the collision with defendant's car; that on the next day following the collision he first discovered that his hearing was affected, and he thereafter became, and was at the time he testified, entirely deaf in his right ear.

Plaintiff's testimony that he was in good health and his hearing was good before the injuries complained of in this case is fully corroborated by his father J. H. Ragland, a grocery merchant at Lebanon.

Plaintiff was seventeen years of age when injured, and, having practically completed the high school course, he was preparing to take a University course. The proof tends to show that plaintiff was and is an intelligent youth, mentally capable of profiting by a liberal education. Of course, the loss of hearing in one ear will not neces-

sarily deprive plaintiff of the opportunity or capacity to obtain an education, but his mental and physical qualifications are elements to be considered in estimating the compensation to which he is entitled. The plaintiff also claims, as an element of damage, that he suffered a "nervous shock" as a result of the collision. We quote from the testimony of J. H. Ragland, plaintiff's father, as follows:

"Q. I will get you to state if you are the father of Joe Hatton Ragland? A. Yes sir.

"Q. Do you remember the time that this accident was reported to you? A. Yes sir.

"Q. Before that did the boy live with you always? A. Yes sir.

"Q. He states his age was then seventeen. Is that correct? A. Yes sir.

"Q. I will get you to state whether he was a healthy or unhealthy boy before that. A. He had always been pretty healthy.

"Q. What has been his condition since? A. Deafness in one ear and nervous shock. He just goes all to pieces over any little thing.

"Q. Did it affect his nerves? A. Yes sir.

"Q. Does he show or not that he is affected on all occasions? A. Yes sir.

"Q. Have you or not had him treated? A. Yes sir.

"Q. Did you or not carry him to a Nashville doctor? A. I did.

"Q. What did you find there? A. Well, the first time we carried him there the doctor said that he was practically deaf. He said he had a little sound in his right ear.

"Q. Did you bring him back here? A. Yes sir.

"Q. Did you let another doctor see him? A. I didn't until I carried him back to Nashville again.

"Q. To the same doctor? A. To the same doctor.

"Q. Have you done everything in the world to restore this boy to his former condition? A. Yes sir, I have.

"Q. Did you let Dr. Witherington see him? A. Yes sir.

"Q. I will get you to state if he isn't an eye and ear specialist in this vicinity. A. Yes sir.

"Q. Did he examine him? A. He did.

"Q. How many times has he treated him? A. He has treated him three times, and I think four. I am not sure whether it is three or four, but he has had him three times.

"Q. Mr. Ragland, did Dr. Jerry McFarland also treat this boy? A. Well, he saw him the first morning after the accident, the next morning.

"Q. That is Dr. Jerry of Wilson county? A. Yes sir.

"Q. I want to ask you as to whether or not this boy is deaf in that ear. A. He is.

"Q. Do you or not know that? A. I know it. Another thing, it is embarrassing to me to have him in the store, with customers coming in and he can't hear them.

"Q. That is how you found it out? A. That is the way I found it out, yes sir.

"Q. Can he hear with that ear when he can't see the lips when that ear is turned and the other one is not turned? A. No sir."

Dr. Jerry McFarland testified that in his opinion the plaintiff's deafness resulted from a fracture or dislocation of the bones of the middle ear. Dr. McFarland is a general practitioner, and not an ear specialist.

Dr. R. L. Witherington, a specialist in diseases of the eye, ear, nose and throat, practicing at Lebanon, testified that he had made two thorough examinations of the plaintiff's ears, and had "looked him over" a third time; that he found that plaintiff could not hear in his right ear; that in his opinion plaintiff's deafness in the right ear was caused by anchylosis of some of the bones of the ear, behind the drum, and will be permanent.

As before stated, it appeared that plaintiff was examined by Dr. E. B. Cayce, at Nashville, on two occasions, a few days after the collision. Plaintiff's father was asked on cross-examination to "tell what Dr. Cayce said about this boy's condition," and he replied as follows: "Dr. Cayce said the first time we carried him there that he could get a little sound out of the boy's ear. He said if nature was stronger than the disease, he would hear. The second time we carried him back he examined him and he says 'I am glad to say that I think it is about fifty-fifty that he is hearing.'"

In the written argument of defendant's counsel it is said: "We feel that the court and jury were entitled to the benefit of Dr. Cayce's full statement on the condition. If he had been favorable to the theory of plaintiff, it would have been fairly assumed that he would have been called as a witness."

In response to this suggestion, it may be said that, so far as we can see from the record, the testimony of Dr. Cayce was as readily available to the defendant as to the plaintiff.

It is further said in defendant's brief that, "while the jury was within its province in disregarding the opinion of Dr. Cayce, we feel that in fairness to the defendant it should be considered by this court as reflecting on the amount of the verdict."

The weight to be given to the opinion of Dr. Cayce (who is shown by the record to be an ear specialist of high standing), which opinion was given very shortly after the accident and appeared only from the cross-examination of Mr. Ragland, was a matter for the jury, and not subject to review by this court.

There is undisputed proof that plaintiff's automobile was damaged to the extent of $300. We may, therefore, assume that the jury assessed plaintiff's damages for personal injuries at $4200.

It is not claimed that there is anything in the record, more than the alleged excessiveness of the verdict, which suggests that the jury was controlled by passion, prejudice or caprice. In actions for personal injuries, there is no certain standard by which the damages can be measured. In the case of Tennessee Coal and Railroad Co. v. Roddy, 85 Tenn., 400, 409, our Supreme Court, speaking through Mr. Justice Lurton, said: "We hold that in actions for damages for personal torts that it is within the strict province of the jury to estimate the extent of the injury and assess the damage, and that unless there is a manifest abuse of this trust, such as to indicate passion, prejudice, partiality, or unaccountable caprice or corruption, the trial judge ought not to interfere." If the trial judge ought not to interfere in such case, then a fortiori the appellate court should not interfere.

Upon the facts of this case, we cannot say that, in fixing the amount of the verdict, the jury did not exercise their fair judgment and sound discretion, "after carefully, honestly, and fairly considering all of the various elements that enter into the question." (109 Tenn., 616). The defendant's third assignment of error is overruled.

This disposes of all the assignments of error. It results that the judgment of the circuit court is affirmed, and judgment will be entered here in favor of the plaintiff Joe Hatton Ragland and against the defendant Elkin Motor Company for $4500, with interest thereon from the date of the judgment below (January 13, 1927), and for the costs accrued in the circuit court. The costs of the appeal will be adjudged against the defendant Elkin Motor Company and the surety on its appeal bond.

Crownover and DeWitt, JJ., concur.